United States v. David Holly, number 191216. I'll hear from Mr. Gutierrez first. May it please the court, Gerardo Gutierrez appearing on behalf of David Holly. Raised two issues. One was the suppression issue. Hi, Judge. Didn't see you there. The suppression issue on the gun and the statements that were made. And then the second issue is the Brady violation and the motion to dismiss. Taking up the first issue, it's pretty straightforward, United States v. Smith. I didn't see anything basically distinguishable other than the two bicycles from the police officers sort of blocking the defendant in an alley. Here Mr. Holly was walking through the Altgeld Gardens on the pathway. Purportedly he was seen and saw two police officers, officers Casal and officer Byrne inside their vehicle. Sorry, that officer Byrne and officer Cofield inside their patrol vehicle. Officer Byrne says he saw the defendant approach from about 40 feet away. And then when he got within visual distance, he saw that he recognized the two officers being police officers. Cocked his head backwards, his eyes widened and gave this oh shit look and made an immediate turn to his left and walked out of sight at a rapid pace. Immediately upon that occurring, officer Byrne gets out of his car. He testified that he did not run after Mr. Holly but he didn't walk either. He jogged, that was his words, he jogged after Mr. Holly until he was able to see Mr. Holly repeatedly ringing the doorbell to a unit that was right off to the side of where the car was parked, where the police officers were parked. At that point, officer Byrne asks Mr. Holly, do you have any guns or drugs on you? And Mr. Holly right away answered, yes, I have a gun on me. The court found this compelling, said that even though there was no Terry violation here, there was no probable cause, that because the question was asked so quickly and the answer came back so rapidly that this was a purely consensual stop and therefore, unlike Smith, he was free to leave and was not boxed in. Mr. Gutierrez, I'm sorry to interrupt you because I want you to continue, but I'm thrown off by this officer Byrne. I have in my mind somebody named Caulfield. Yeah, Caulfield. Who's Byrne? Byrne is the officer, sorry, I didn't mean to speak over you. Byrne is the officer that remained for a few seconds behind, allowing his partner Caulfield to run up on. Who was the one that asked the question? Caulfield or Byrne? Caulfield. Okay, all right. Mr. Gutierrez, are you claiming that the district court's factual findings after the suppression hearing were clearly erroneous,  there's a Fourth Amendment violation here? Yes, Judge. I am not saying that the district court's factual findings are 100% wrong or 100% correct, but to the extent that Your Honor is asking me are they correct enough, yeah, they're correct enough. So for appellate purposes, for your appeal here today, you are not arguing that the district court's factual findings were clearly erroneous. Is that correct? That's correct, Judge. You're saying accepting those factual findings, there's still a Fourth Amendment violation under Smith. Is that correct? That is correct, Judge. What about the fact that unlike Smith, there was no attempt to block his path? He was in a public place. There was no tone issue. There were no guns drawn. Doesn't that take this out of the Smith realm? Well, in Smith there were no guns drawn either, Judge. There was no touch. I think in Smith he had his hand on his gun. There's no testimony here. And the judge didn't find that he had his hand on his gun when he asked the question or approached him. That's correct, Judge. And we're saying that regardless of whether Caulfield had his hand on his gun, he was definitely armed. He had on a bulletproof vest. They looked like they were ready for bear. They were armed for whatever encounter happened. By their own admission, they decided to travel in tandem for their own safety. They wore well-marked bulletproof vests that identified themselves as police and that Mr. Holley, his position is that he was going into that house, that he was going to talk to somebody in that house. So when you say free to go, unlike in the Smith case where he was sort of boxed in by two police officers on bicycle, Mr. Holley, if he would have been allowed to continue to go, he would have ran the doorbell and spoke to the woman inside and asked about his friend who may or may not have been there. The problem with that is, though, that at the same time that this occurred, Officer Byrne is running in from his side. He could definitely be seen and heard, and then Officer Casales is coming in from the other direction. But he's already answered the question at that point. And he's already been patted down by that point. He's already answered the question at that point according to the testimony that was elicited and according to the testimony that was credited by Judge Durkin. So given that he's already asked the question at that point, Officer Byrne asks the questions when it's one-on-one. When you're sitting there, Judge, asking me questions, you're about 10 feet away. In the Smith case, they were about 5 feet away. In this case, there's testimony that they were within 2 feet of each other. That Mr. Holley and Officer Byrne were within 2 feet of each other. So is it your position then, Mr. Gutierrez, that whenever a police officer who's armed and is in police garb and clearly a police officer asks an individual a question about illegal activity, that it is not consensual? I'm not saying that in every situation it's not consensual, Judge. But by the mere asking of that question as your first apres-vous, as your first statement to the individual, that's an interrogation. And the law also suggests that each individual has to be taken as the individual being questioned. In other words, in this case, Mr. Holley had just come out of jail. And these two officers were the same officers that had arrested him before. Did Officer Byrne know he had just come out of jail? I know he arrested him before, but is there any evidence that he knew that? Well, there's evidence that both of them said afterwards that they recognized each other. And I don't know exactly at what point they recognized each other, but certainly when you're 2 feet away from the individual that arrested you the year before, you would know who that individual is. How do we deal with our decision in Breland? So in Breland, you may recall the police say to this fellow in Breland who matched a description of somebody, I think, you know, quote, police, I want to talk to you, unquote. You know, you could look at that and say, geez, the police saying something like that to you? You better stop and at least engage in some discussion. But we hold that that's a voluntary encounter. That's not a seizure. And so I don't know how, if Breland's correctly decided, and I think we have to accept it as such, I don't know how you get around that. Well, Judge, in Breland, I believe that the case, they were investigating a specific incident, a specific crime, similar to Smith. There's an alternative holding in Breland, if that's what you're right, that it's a voluntary stop. But there's also a separate, you know, primary holding. This isn't even a seizure. Well, Judge, in this case, the court held immediately that there was a notary stop. So we have to look at it purely in the lens of a person being stopped, not stopped because Mr. Holly was stopped. He wasn't going anywhere other than trying to get into that apartment and speak with the resident inside. So if you look at it in terms of an alley, he's blocked by his own purpose trying to get somewhere, and Officer Byrne approaches him fully dressed, fully armed, whether he was holding his gun at his side or whether he had it out. I know that that makes some difference. But when you have a person who's walking around in a high-crime area on New Year's Eve and it's a person that had, from his point of view, from Mr. Holly's point of view, been arrested the year before on a drug charge where he did run. In that case, he did run. In this case, he walked away, and he was chased down by the police. So there's no way a police officer could come up on you and stand within two feet of you and not say, you're free to leave, I'm the police, I want to ask you some questions. There was no tête-à-tête prior to just saying, do you have any guns or drugs on you? And Mr. Holly knew enough to know that those encounters aren't that free to go. He wasn't at liberty to walk away, and when asked that specifically, the police officer said, no, I didn't tell him that. So, I mean, that's pretty straightforward. We'll give you a minute or so in rebuttal and hear from the government now. Ms. Bonamici. May it please the Court, good afternoon. The district court correctly decided that the encounter in which the defendant admitted that he had a gun was a consensual one. After a careful review, very, very meticulous review of the record, including the testimony of all the witnesses, which included both Officer Caulfield, who was the one who did the questioning that's primarily at issue, and Officer Byrne, who was his partner driving the car, who followed afterwards. At the time of the questioning, to be clear, the evidence showed and the district court found there was a single officer present. There was no officer coming up behind. There was no officers coming from both sides. That description of the events does not match either the evidence or the district court's findings, which were definitely not clear error. Ms. Bonamici, the officer here, Caulfield, did not tell the defendant that he was free to leave, and that's one of the factors this Court has said is relevant to the question of is the encounter consensual or not. What impact should that have on our analysis? Well, that is a factor to be considered. But as the district court correctly found, we believe, it's not a fact that was sufficient to override all of the other evidence, the evidence which, Your Honor, Judge St. Eve just listed off, the evidence that was in a public place, that there was no blocking, no touching of the defendant, no hand on the gun, no display of weapons, there was a single officer and not multiple officers, no show of force, nor was there any statement made to suggest that the defendant himself was under investigation other than just to ask the question, do you have a gun or narcotics on you? What happened instead was that the officer approached the defendant on a cement pad in front of one of the residents, which is a square, but it's at ground level. I think we may have referred to it as a stoop in the brief, but I don't think that's quite accurate because it was just a cement pad. Walked right up to him and asked him a question, and the defendant immediately without reservation answered the question, I have a gun in my pocket. And at that point, the search took place, the gun was recovered, et cetera. It's a multi-factor test. The courts have held that one factor is not dispositive. They all must be considered together. And in this context, the vast majority of the factors weigh heavily in favor of a consensual encounter here. The defendant says, or counsel says that he is not arguing clear error as to any of the court's factual findings, but of course the briefs spend quite a lot of time on arguments that do suggest that that's the main import. And the result of that, I think, is that the arguments get kind of combined and convoluted as between what are the factual questions, what are the legal questions. But in this case, the record reflects an extraordinarily detailed analysis of all of the evidence and also a detailed analysis of the credibility questions of whether the district court should have credited the defendant's testimony over the officer's or vice versa. And there's nothing in the court's analysis that could even remotely be considered clear error here. So just to make that point clear, the vast majority of the factors in Smith weigh in our favor or weigh in the favor of the district court's decision. And there's nothing that's been argued to suggest that there's any discrepancy here. So in our view, and as to the question that you asked Judge St. Eve about, aren't you really saying that a police officer can't walk up to a citizen and ask them a question? I mean, I think that's really where we are. In fact, it's a factor that weighs in favor of a consensual encounter that the police announced their office and identified themselves and were clearly identifiable as the police. Had the question been asked by an undercover agent with no reason for the defendant to believe that he was talking to the police, there would have been other problems. The part of this that gets hard for me, and I very much understand your emphasis on the multi-factor part of this, someone that's identifiable as a uniformed police officer that asks a question, and I understand it's not the factual finding here, but that asks a question that can really only be heard as accusatory because of the tone in which it's, the manner, the way the officer approaches the individual, that seems highly, highly relevant to me in answering the question, was the individual seized? I don't think that that's unfair, Your Honor. I mean, in terms of it being a factor and an important one in certain cases, but there was no evidence that any of that occurred in this case, just to be absolutely clear, none whatsoever. And the evidence, in fact, demonstrated the opposite. And the question that was asked here is actually a question that would be asked in virtually any circumstance, particularly with respect to the gun, just for officer safety. I mean, it was not asked, there was no evidence that it was asked in an accusatory tone, and even the defendant's testimony on that was vague. In fact, wasn't there a finding to the contrary? Yes, yes, yes. That's a better way of saying it. But so perhaps, but it is hard. I think it's going to be very hard to parse these circumstances, and if we're going to say that the police are allowed to, and we're going to and we must, say that the police are allowed to ask a citizen a question on the street in a public place, then they have to be permitted to do that. And trying to parse between particular tones, and as the defendant tries to suggest, try to analyze what this defendant's subjective reaction to that might be. It's not what the law requires or provides, and it's not what the law should be either. I'm not sure that the defendant argued the second point about the videotape. So if your honors want to hear argument on that, I'll provide it. But if not, then I'll leave it alone. I would like to mention something about it, that the process for the police to obtain CHA video involves nothing more than leaving a voicemail for someone who may or may not receive the message. It isn't a reasonable effort to preserve the evidence. I thought that the finding of negligence when there was no follow-up by the officer was quite generous. It seems to me that if you are in contact with the CHA, that they ought to, at the very least, be requiring employees to leave an out-of-office message on their voicemail. So that isn't a question. It's getting something off my chest. Well, Your Honor, I do believe that everybody who reviewed that situation found that it should not have happened that way. And I can say that, I mean, there was action taken by the police, and I assume there was action taken by the CHA, but you're absolutely right. It should not have occurred that way. But, of course, and I understand that Your Honor isn't suggesting this, but, of course, that alone would not support a finding of a Brady violation here. So if there are no further questions, the government would ask that the Court affirm the District Court's judgment. Thanks very much. Mr. Gutierrez, you want to take a minute and wind up? Yeah, I just wanted to say thank you, Counsel, back there also. It's hard to imagine a scenario where a police officer in a high-crime area approaches an individual and stands less than two feet away from him and asks, do you have any drugs or weapons on you, in a non-accusatory tone, whether it's an accusatory tone in regular speech, whether it's an accusatory tone in a gentle flurry, whether it's an accusatory tone in a nice way. It's an accusatory question and not a question that most people would take as, oh, yeah, well, I guess I'm free to leave. I'm not even going to answer this police officer. Thank you. Thank you very much. Thanks to both Counsel. The case is submitted. We'll move to our final.